IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
July 14, 2009 Session

## ROOSEVELT MORRIS v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Shelby County**
**No. 02-06321     Chris Craft, Judge**

---

**No. W2008-01449-CCA-R3-PC  - Filed October 11, 2010**

---

Petitioner Roosevelt Morris was convicted of two counts of attempted murder, and received an effective sentence of fifty years in the Tennessee Department of Correction. This court affirmed the conviction on appeal but reduced his sentence to forty-seven years. Petitioner filed a petition for post-conviction relief, arguing that his counsel was deficient for (1) failing to object to the State's questions and closing arguments concerning Petitioner's post-arrest silence; (2) failing to object to other prosecutorial misconduct during the closing argument; and (3) failing to have the magazine and the unfired bullet in the firearm used in the crime examined for fingerprint evidence. Petitioner also contends that his sentence violated Blakely v. Washington, 542 U.S. 296 (2004), and its progeny. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ALAN E. GLENN, JJ., joined.

Lance R. Chism, Memphis, Tennessee, for the appellant, Roosevelt Morris.

Robert E. Cooper, Jr., Attorney General and Reporter; Cameron L. Hyder, Assistant Attorney General; William L. Gibbons, District Attorney General; and Chris West, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## I. Background

We detailed the facts leading to Petitioner's conviction in our opinion adjudicating his direct appeal. See State v. Roosevelt Morris, No. W2004-02277-CCA-MR3-CD, 2005 WL 6235723, at *1-6 (Tenn. Crim. App. at Jackson, Sept. 7, 2005). They are as follows:

Teresa Washington testified that she met and began dating [Petitioner], in December 2000. In approximately September 2001, the two began living together in a residence on Glankler. In approximately November 2001, [Petitioner] moved out of the residence, taking his furniture with him. Ms. Washington stated that she "just no longer wanted to be with him. He was controlling." Ms. Washington testified that after [Petitioner] left, he started calling her and going by her residence and her work-place. She did not want or invite or encourage these calls or visits.

Ms. Washington stated that [Petitioner] threatened her, "saying things like he wasn't going to leave her alone. And that if he couldn't have her, no one else could have her." When Ms. Washington met James Davis in January 2002 and began dating him, she sought and obtained an order of protection against [Petitioner]. The order was entered by the general sessions court of Shelby County, Tennessee, on February 12, 2002. A copy of the order was admitted into evidence and provides, in pertinent part, that [Petitioner] "is refrained from coming about Ms. Washington for any purpose and specifically from abusing, threatening to abuse her, or committing any acts of violence upon her." The order also prohibited [Petitioner] from telephoning Ms. Washington, stalking her, and committing acts of violence against her property. According to Ms. Washington, [Petitioner] was not deterred by the order, but continued to call her and come over to her home. She stated that, at one point, he "pulled up all her landscaping and put black tar over her motion detector lights so that they wouldn't go off and unscrewed her light bulbs."

Ms. Washington testified that [Petitioner] called her on the morning of May 17, 2002, and told her he "had something for her." She replied that he did not have anything for her and hung up. That night, she arrived home at about 12:30 a.m. Mr. Davis was already at her home. She parked her car behind his in the single lane driveway. She went to bed with Mr. Davis but heard noises that sounded like someone was outside. She told Mr. Davis but he replied that it was just the wind. She tried to look out of her windows with a flashlight but did not see anything.

She and Mr. Davis woke up at about four o'clock that morning. Mr. Davis had to leave to go to work. Ms. Washington went out of the house so that she

-2-

could move her car in order that Mr. Davis could leave in his car. She opened the front door and began to open the glass storm door. Mr. Davis was standing behind her. Ms. Washington described what happened next:

> I opened my door and I seen someone standing over to my right and I screamed. And I seen this flashing, a boom go off. And it went off again. I just saw a flash. So I fell out on my floor and I played dead.

Ms. Washington said that, with the second "boom," which was just seconds after the first one, she felt a bullet go past her left temple. As she was laying in the doorway curled in a fetal position "playing dead," she felt the person step over her into the house. She then heard more gunshots and the sound of one or more persons falling to the floor. Ms. Washington next heard Mr. Davis pleading for his life and telling the intruder to let the gun go. At that point, she testified, she heard [Petitioner's] voice. [Petitioner] said that they had ruined his life and that he was going to kill them.

When Ms. Washington realized who the intruder was, she jumped up and ran to see if she could assist Mr. Davis in wresting the gun from [Petitioner]. The two men were on the floor struggling, with Mr. Davis on top of [Petitioner]. Ms. Washington jumped on Mr. Davis' back and reached down, trying to get the gun away from [Petitioner]. She then noticed that [Petitioner] was wearing gloves. At that point, she testified, she "just panicked and . . . just went after [Petitioner's] eyeballs." Ms. Washington tried to gouge out [Petitioner's] eyes with her fingers.

Ms. Washington did not realize that Mr. Davis had been shot. As she was on his back trying to injure [Petitioner], Mr. Davis told her that he had been shot and that she was "smushing" him such that he couldn't breathe. Ms. Washington got off of Mr. Davis and ran to a neighbor's house to call the police. When the neighbor answered the door, she explained what was happening. The neighbor called the police and would not let Ms. Washington leave until the police arrived.

James Davis testified that he is six feet, two inches tall and weighs 280 pounds. He stated that he knew of [Petitioner] prior to the shooting, but had not met him. They had spoken over the telephone three or four times when [Petitioner] was seeking to speak to Ms. Washington. Mr. Davis stated that his conversations with [Petitioner] during these calls were not hostile.

-3-

Mr. Davis testified that, on the night in question, he arrived at Ms. Washington's house at around midnight; Ms. Washington was already there. They went to bed and woke up at about four o'clock a.m.; he was running late for work and was in a hurry. When he went to leave, Ms. Washington was in front of him at the front door. Mr. Davis testified:

> Ms. Washington opened the inner door and she unlocked the outer door and all of a sudden a body appear. I hear a shot, boom, she screams, she falls. And, well, after that this gentleman entered the house, he shoots me and he's just goes shooting three or four more times.

Mr. Davis testified that the "gentleman" was wearing a cap, a black jacket and black jeans. He was also wearing black gloves.

Mr. Davis stated that he thought he recognized the intruder as a man that he had seen walking in front of the house a number of times. Mr. Davis explained that the intruder was the same height and had the same "high cheekbones" as the man he had seen previously.

Mr. Davis explained that the intruder shot him as he stepped over Ms. Washington and entered the house. Mr. Davis was shot in the right chest. The intruder shot several more times as he came into the house. The shots then paused and Mr. Davis noticed that the intruder was "messing with" the gun because it had "jammed." At that point, Mr. Davis threw his hands around the intruder's neck and "throwed him on the floor." The intruder hit his head on the coffee table as the two men fell to the floor. The two men began struggling over the gun. The intruder said, "Y'all don't know what love is. Y'all done ruined my life."

The men continued to struggle over the gun. Ms. Washington got up and jumped on Mr. Davis' back. She tried to gouge out the intruder's eyes and was jumping up and down on Mr. Davis while doing so. Mr. Davis told her to "get up" because he had been shot. Ms. Washington then ran out of the house.

Mr. Davis kept trying to get the gun away from the intruder but he would not let it go. After Ms. Washington left, he finally let go of it. Mr. Davis stated that the intruder then got up and ran away. Mr. Davis was not able to chase after him, but made it out onto the front porch. He hollered for help but kept getting weak. He laid down on the porch and the next thing he knew, the

police were there. They discovered a handgun under Mr. Davis and took control of it. The paramedics then arrived and took Mr. Davis to the hospital.

Mr. Davis identified [Petitioner] at trial as the intruder who shot him. Mr. Davis also identified a cap recovered at the scene as the one worn by [Petitioner] during the attack.

Officer James Gaylor received a "shots fired" call and responded to the scene at about 4:45 in the morning on May 18, 2002. He saw a man lying on the porch who appeared to be hurt or wounded. Officer Gaylor approached and noticed a handgun laying under the man; the man did not have the gun in his hand. Officer Gaylor recovered the gun and handed it to Officer Paul Bishop, who had also arrived on the scene.

Officer Paul Bishop testified that he checked the gun and found one live round in the chamber, none in the magazine. Officer Bishop described the gun as a .380 semiautomatic. Officer Bishop identified the gun at trial and it was admitted into evidence. He stated that he determined during his investigation that the gun had not been reported stolen, but he did not know who owned the gun.

Officer Bishop explained that Ms. Washington was across the street when he arrived, "frantically screaming." She came over to them as they were attending to Mr. Davis. Officer Bishop stated that it took about an hour for Ms. Washington to tell him what had happened. By this time, Mr. Davis had been transported to the hospital. Officer Bishop testified as to what Ms. Washington told him as follows:

> She stated that her boyfriend, Mr. Davis, had to go to work. That she had to move her car, it was a single car driveway with the two cars parked in the drive. She said that she opened the door, she saw something off to the side and then heard two shots. The door that she had opened was a wrought iron door that had glass panels in it. The glass panel shattered. She fell backwards into the house.
>
> She then stated that, that she was laying on the ground when her ex-boyfriend rushed into the house, more shots were fired. Mr. Davis was struck. That the two were wrestling on the ground. And she told me that she tried to gouge his eyes out.

Officer Bishop also stated that Ms. Washington told him the attacker's name was Roosevelt Morris. She also told him that [Petitioner] had threatened her over the phone the day before, telling her he had "something for her." Ms. Washington told Officer Bishop about the order of protection.

Officer Bishop went to the hospital later that morning and spoke with Mr. Davis. He asked Mr. Davis about what had happened and Mr. Davis told him "that he was leaving his girlfriend's house when her ex-boyfriend entered the house. That they fought over a gun and he got shot." Mr. Davis told Officer Bishop that the ex-boyfriend had brought the gun into the house.

The police put out a bulletin on [Petitioner] advising that he might have eye injuries. A call came in from the same hospital in which Mr. Davis was located that a man had come in with eye injuries. Officer Bishop responded and found [Petitioner] in a trauma room. [Petitioner's] eyes were bleeding. Officer Bishop asked [Petitioner] his name, and [Petitioner] responded, "Roosevelt Morris." Officer Bishop placed [Petitioner] under arrest. Officer Bishop had no further conversation with [Petitioner].

Sergeant Michelle Oliver testified that she was one of the crime scene officers investigating this case. At the scene, she found broken glass on the front porch and what appeared to be blood. She described the items inside the front room of the house as "disheveled." She and Officer Alvin Peppers collected two empty shell casings from inside the house and she saw two holes in one of the walls that appeared to have been made by bullets. They found no shell casings in the yard. She did not test for any fingerprints at the scene.

Officer Alvin Peppers, who assisted Sgt. Oliver as a crime scene officer, testified that there appeared to have been a struggle inside the residence. He described the two shell casings collected as .380 caliber.

[Petitioner] testified on his own behalf. He acknowledged his past romantic relationship with Ms. Washington and agreed that they had lived together on Glankler for several months. He offered a different explanation of why they broke up, however. [Petitioner] testified that Ms. Washington had "at times . . . a very nasty attitude, and was very controlling and very demanding." [Petitioner] also found Ms. Washington's mother "absolutely intolerable." The final straw, however, was some nude photographs that Ms. Washington kept of her ex-boyfriends. Ms. Washington refused to destroy the photographs in

spite of [Petitioner's] request. When he discovered that she had kept the photographs, he "just couldn't . . . take no more." At that point, he moved out and they broke up.

[Petitioner] testified that Ms. Washington was pregnant at the time they broke up. He stated that, after he left, she filled up his answering service with messages: "all of them were pleading him to come back home. Why did he leave? . . . Oh, what about the baby?" When he returned the calls a few days later, she was "absolutely furious." She told him she was going to have an abortion.

[Petitioner] next spoke with Ms. Washington by telephone in January. He described this conversation as "very amiable." He stated that she told him that she had had the abortion, and wanted to know if he was interested in knowing if it was a boy or a girl. He thought he remembered her telling him it was a boy. Later that month, he testified, they got together and ate, went shopping, and then to a hotel. [Petitioner] stated that he and Ms. Washington had consensual sexual contacts three or four times between January 2002 and May 18, 2002. [Petitioner] also stated that he was aware of the order of protection during this time.

[Petitioner] testified that Ms. Washington left a message on his service on May 17, 2002. When he returned the call, she told him she wanted to get together. He asked her for a good time to come by, and she told him it would have to be after three a.m. so that Mr. Davis would be gone. She told him to knock "lightly" on the door and that if she did not answer, to leave. [Petitioner] followed these instructions. Ms. Washington opened the door and as he began to walk into the house, he noticed a "strange look" on Ms. Washington's face. [Petitioner] stated that it "wasn't a pleasant look." As he went through the door, he stated, he saw Ms. Washington looking beyond him and he felt a "presence" behind him. He turned around and saw Mr. Davis behind him with a gun.

According to [Petitioner], he and Mr. Davis began struggling with the gun at that point. [Petitioner] described himself as five feet, six inches tall, 180 pounds, and said he knew what he had to do was to hold onto the hand in which Mr. Davis held the gun. [Petitioner] stated, "I would not let it go." During the struggle, Ms. Washington struck [Petitioner] on the back of his head with an object.

[Petitioner] stated that the gun went off several times during the struggle. [Petitioner] stated that the gun went off while they were in the house and that the struggle continued outside onto the porch where the gun discharged again. During the struggle, somebody started gouging him in his eyes. At some point he heard Mr. Davis say something about being hurt or hit or something and while Mr. Davis seemed distracted by his condition, [Petitioner] fled. He stated that he ran around to the next street and returned to the hotel room that he had rented for his "rendezvous" with Ms. Washington. From there he managed to drive to his brother's house where he was living, in spite of his "substantially injured" eyes. From there, he stated, his brother called 911. An ambulance arrived and took him to the hospital.

According to [Petitioner], he had suffered from a "fractured skull" and "air on the brain." Additionally, "the protective skin over the outer eye was severely lacerated" and his corneas and retinas were "severely damaged." He was told, he said, that his fractured skull could not be treated and he was given "something, they said it would, they would dissolve that air bubble."

Id. (brackets omitted).

Petitioner asserted at trial that the police immediately focused their investigation on him. Petitioner maintained that despite his desire to speak with the authorities, he was never given an opportunity to do so. According to Petitioner, the police investigation was conducted in a shoddy manner and gave unjustified weight to the victims' allegations.

On cross-examination, Petitioner acknowledged that he did not contact police after the shooting, that he fled the scene, and that his testimony at trial was the first time he had given his version of the shooting.

In support of his claims of shoddy police work, Petitioner called Sergeant E.J. Prewitt to testify at trial. A member of the Memphis Police Department's Domestic Violence Unit, Sergeant Prewitt was the coordinator for the case. On direct examination, Sergeant Prewitt testified that he took Ms. Washington's statement but no others. He explained that he was unable to take Petitioner's statement at the hospital because Petitioner was unable to communicate. Furthermore, he testified that he never attempted to get Petitioner's statement after Petitioner was released from the hospital. On cross-examination, the State elicited without objection that Petitioner never approached Sergeant Prewitt to make a statement.

Petitioner's trial counsel took an admittedly "novel" tack during closing argument by delivering it largely in the character of what Petitioner asserted was Ms. Washington's

vindictive alter ego, "Reecy." Counsel, playing the part of Reecy, told the jury that Reecy had orchestrated the attack on Petitioner and that she "contoll[ed]" the criminal justice system to get away with it.

On rebuttal, the State lashed out at Petitioner's closing, calling it, among other things, a "forty-five minute comedy routine." The State argued that Reecy was a "fat figment of [Petitioner's] mind." It also rejected the notion that Ms. Washington had manipulated the criminal justice system, specifically arguing that the system had not been "fooled" by Ms. Washington. The prosecutor further argued that he had an ethical obligation "to seek truth and justice" and that he could not present a case that he did not believe had a factual basis. These comments alluded to an exchange between counsel and Petitioner during his cross-examination in which Petitioner explained that he did not tell the prosecutor his side of the story because he assumed the prosecutor was only interested in convicting him.

The jury convicted Petitioner on both counts, and the court sentenced him to an effective term of fifty years incarceration. On appeal, Petitioner asserted, among other things, that his sentence violated the United States Supreme Court's decision in Blakely v. Washington, 542 U.S. 296 (2004). We affirmed Petitioner's conviction. In rejecting Petitioner's Blakely argument, we held that our decision was controlled by the Tennessee Supreme Court's decision in State v. Gomez, 163 S.W.3d 632 (Tenn. 2005) (Gomez I). Nevertheless, in our de novo review of Petitioner's sentence, this court concluded that the trial court improperly applied enhancement factors and modified his sentence to forty-seven years. Petitioner did not seek review from our supreme court.

Petitioner then filed a pro se petition for post-conviction relief. He was appointed counsel, who filed an amended petition raising numerous claims of ineffective assistance of counsel. The post-conviction court denied relief.

On appeal, Petitioner contends that his trial counsel was ineffective for failing to object to (1) questions regarding his post-arrest silence during Sergeant Prewitt's cross-examination; (2) the State's comments about Petitioner's post-arrest silence during closing argument; and (3) other instances of prosecutorial misconduct. He also asserts that counsel was ineffective for failing to have the gun's clip, the bullet casings, and the unfired bullet tested for fingerprints. Finally, he contends that his sentence violated Blakely and that pursuant to the United States Supreme Court's decision in Danforth v. Minnesota, 552 U.S. 264 (2008), this court should apply the Blakely rule retroactively to correct that error.

At the post-conviction court's hearing on the petition, Petitioner's trial counsel, who had practiced criminal law since 1993, recalled that she met with Petitioner "numerous times" prior to trial and that she prepared the trial strategy with his assistance. Counsel said

the State offered a fifteen-year sentence if Petitioner pled guilty. However, Petitioner refused the offer and insisted on going to trial. Petitioner was upset because the police had never interviewed him regarding the shooting. Petitioner believed that the police investigation was "shoddy." Counsel testified that Sergeant Prewitt was called in order to support the defense claims that the investigation was inadequate.

Counsel testified that she did not object when the State asked Officer Bishop during its case-in-chief whether Petitioner spoke to the officer while he was at the hospital. She explained that it was not objectionable given the defense's theory of the case. In particular, trial counsel explained that although "on the surface" such questioning might be objectionable, "one of the things that [Petitioner] really wanted to point out during this trial was self-defense and the fact that Miss Washington had scratched his eyes out." Consequently, while the questions "could have been interpreted" as commenting on Petitioner's post-arrest silence, "as far as the defense theory goes for self-defense, that was something that [Petitioner] wanted . . . to be known to the jury." Trial counsel also recalled that because she was unable to interview Officer Bishop before the trial, she did not know what his answer would be and thought that it could be helpful to the defense.

Trial counsel testified that she questioned Officer Bishop about whether he interviewed Petitioner at the hospital shortly after the incident. She said she did so because she wanted to draw out that Petitioner was physically incapable of participating in an interview "because he had been so maimed by Mr. Davis."

Trial counsel was then asked about why she questioned Officer Bishop about whether "anyone ever interview[ed]" Petitioner. She explained that Petitioner "was very adamant about the fact that he was actually the victim of a crime and no one ever took a statement from him." Petitioner "wanted that to be known." Trial counsel further testified that she advised the prosecutor that Petitioner wanted to give a statement but the prosecutor "was not interested." She added that Petitioner "was upset and offended by the fact that the State of Tennessee had never asked him his side of what happened." On cross-examination, trial counsel explained that eliciting this testimony was part of her trial strategy, and thus "there were multiple reasons why [she was] bringing [it] up in trial."

Trial counsel's testimony then turned to the examinations of Sergeant Prewitt. She testified that she asked Sergeant Prewitt whether he took any statements from Petitioner because the defense was "trying to point out during the trial . . . that there was shoddy investigation. And by asking these types of questions, [trial counsel] thought that that would help . . . further that point." She recalled that she also asked Sergeant Prewitt whether he "questioned the neighbors" so that the jury could "get a full feel of exactly what happened." In short, as trial counsel testified during cross-examination, she asked Sergeant Prewitt these

questions as "part of [the defense's] theory of the case." Trial counsel also testified that when the State asked Sergeant Prewitt on cross-examination if Petitioner ever came to the police to give a statement she did not think an objection was appropriate because she had "already opened the door to [those] types of questions."

During Petitioner's testimony at trial, trial counsel asked Petitioner whether he was "ever offered a chance to make a statement." Petitioner responded that he was not and explained why he thought he was not given such a chance. At the post-conviction hearing, trial counsel testified that she asked these questions because she was "trying to show that during the police investigation . . . [the police] weren't trying to get a feel for the entire story." She explained that Petitioner "wanted his story to be told because he felt that he had been victimized himself, and he felt that that would help his case."

When Petitioner was cross-examined by the State, trial counsel did not object to a line of questions concerning whether Petitioner ever made a statement to the police. At the post-conviction hearing, trial counsel explained that she did not object to the questioning because of all the testimony she elicited on direct examination about Petitioner not being able to make a statement. Trial counsel recalled that, at Petitioner's "insistence," the defense "opened the door to that line of questioning." Consequently, trial counsel did not "[feel] like that . . . objection would . . . have been well taken by the Court."

Trial counsel's post-conviction testimony then turned to questions regarding the State's closing argument. In particular, trial counsel testified that she declined to object to certain arguments made by the State concerning Petitioner's post-arrest silence because they were simply a recitation of "testimony that was actually brought out during the trial." At other points, trial counsel declined to object because she considered the argument to be the State's "theory of the case," which it is allowed to present at closing. At still other points, such as when the State explained that Petitioner waived his right to remain silent when he took the stand to testify, trial counsel stated that she did not object because the State began by noting that Petitioner did not "have to prove anything." She testified, however, that the State's argument concerning Petitioner's silence while he was in the hospital "got past" her and that she should have objected because the evidence at trial was that Petitioner was physically unable to make a statement at that point. Trial counsel further testified that she did not consider the State to ever be equating Petitioner's silence with guilt. Rather, she interpreted the State's argument to merely be "responding to [Petitioner's] testimony that he'd never been given an opportunity to make a statement." Trial counsel testified that she was familiar with the law concerning a criminal defendant's right to remain silent, however, she explained, "that was something that [Petitioner] was waiving because he wanted to . . . make statements and he wanted to bring it out during the trial that he . . . had never been given an opportunity to make a statement."

-11-

Trial counsel recalled that she did not object to the portions of the State's closing argument concerning prosecutorial ethics and the prosecutor's oath "to seek truth and justice" because she believed the State "was referring to some direct testimony given by [Petitioner] . . . that [the prosecutor's] job was to seek convictions." At other points, trial counsel declined to object because she was unable to make sense of the State's argument. But she recalled objecting to the State's argument comparing the prosecutor's obligation to "seek truth and justice" and a defense attorney's obligation to "zealously represent her client." On cross-examination during the post-conviction hearing, trial counsel testified that she objected to the State's closing at certain points "because of the way [she] felt that [the State] was characterizing the job of defense attorneys." She recalled that the trial court ruled that the State should address the ethical obligations of defense attorneys later in the closing, but the State did not do so. Trial counsel therefore objected again at the conclusion of the State's argument. The trial court said it would give a curative instruction.

Trial counsel testified that she used a novel style in her closing argument. She said she learned of this style during a Tennessee Association of Criminal Defense Lawyers seminar and had used it successfully at prior trials. Trial counsel said that during her closing she assumed the role of Ms. Washington's purported "alter ego," Reecy, to highlight the inconsistencies in the State's case. Trial counsel believed it was an appropriate technique "because of the importance that [Petitioner] gave to the fact that Ms. Washington had this alter ego and the way that this dichotomy of personality caused her to shift from one person to another." She testified that she objected at certain points when the State argued on rebuttal that her closing was "degrading" and "insulting," but that she did not object to all such comments because the State's "comments were aimed at [her] rather than [Petitioner]." Trial counsel testified that she did not "feel [the State's rebuttal] was a personal attack on [her]," but rather indicated that the State "wasn't familiar with the type of closing that [she] was doing."

Regarding the weapon, trial counsel testified that the gun used to shoot Mr. Davis "was not lost or stolen." She recalled that she attempted to determine to whom the gun was registered, but she was unsuccessful. Regardless, the ownership of the gun was not an issue "because it wouldn't have mattered who the gun belonged to" because "[t]he testimony was going to be that [Petitioner] used it to shoot Mr. Davis and shoot at Ms. Washington." Likewise, trial counsel did not have the gun tested for fingerprints "[b]ecause everybody's hands had been on [it]."

Petitioner declined to testify at the post-conviction hearing.

## II. Analysis

-12-

A defendant is entitled to relief under the Post-Conviction Procedure Act when his "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. To be successful in his claim for post-conviction relief, Petitioner must prove all factual allegations contained in his post-conviction petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). On appeal, we conduct a de novo review of the post-conviction court's findings of fact, but we presume its findings are correct "unless the evidence preponderates against [them]." Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001); see also State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999); Henley v. State, 960 S.W.2d 572, 578-79 (Tenn. 1997). We do not "reweigh or re-evaluate the evidence or substitute [our] own inferences for those drawn by the [post-conviction] court. Furthermore, questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the [post-conviction] judge." Fields, 40 S.W.3d at 456 (citation omitted). However, a claim of ineffective assistance of counsel is a mixed question of law and fact, see Burns, 6 S.W.3d at 461, and we review the post-conviction court's conclusions of law, "such as whether counsel's performance was deficient or whether that deficiency was prejudicial," purely de novo, "with no presumption of correctness," Fields, 40 S.W.3d at 458.

## A. Ineffective Assistance of Counsel

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, "the petitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). The petitioner must counter the strong presumption counsel's conduct fell within the range of reasonable professional assistance with which we must begin. See Strickland, 466 U.S. at 690. To establish deficient performance, the petitioner must show that counsel's performance was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). To establish prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. Moreover,

> [b]ecause [the] petitioner must establish both prongs of the test, a failure to
> prove either deficiency or prejudice provides a sufficient basis to deny relief

on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component.

Goad, 938 S.W.2d at 370 (citing Strickland, 466 U.S. at 697).

### 1. Questions and argument regarding post-arrest silence

As explained above, Petitioner asserted that he was the actual victim. He claimed that Ms. Washington invited him to her house and that upon his arrival he was attacked by Ms. Washington and Mr. Davis.

Petitioner chose not to tell anyone in law enforcement his version of the events until he took the stand. There is no dispute that he did not wait for the police at the scene, nor did he go directly to the police afterward. In fact, he did not see the police until he was in the hospital where, both sides agree, he was unable to communicate. He was placed under arrest at the hospital, but he was not questioned and, according to the record, was not informed of his Miranda rights. He then withheld his version of the events until trial. The police never came to him for an interview, and he did not go to the police requesting one. These facts are largely undisputed.

As explained above, the defense's theory was that Petitioner was the victim and that the police conducted a sloppy, one-sided investigation. In laying out that theory, trial counsel repeatedly asked the police whether they interviewed Petitioner in order to elicit that they had never talked with him. Trial counsel called Sergeant Prewitt as a defense witness to make that point. Furthermore, Petitioner himself testified to the same effect.

Responding to Petitioner's theory, the State asked both Petitioner and Sergeant Prewitt whether Petitioner ever volunteered a statement. It did so to elicit the fact that Petitioner never told anyone in law enforcement that he believed he was the victim of a crime, and was thus wrongfully accused, until the day he took the witness stand at trial. At closing, the State repeatedly argued that Petitioner's silence between his arrest and trial indicated that his story was not credible. Indeed, it asserted that Petitioner remained silent specifically so that the State could not investigate his story because he knew it was false. Trial counsel did not object as the State elicited this testimony and made these closing arguments.

Petitioner claims trial counsel's decision to not object to either the State's questioning or its closing rendered her ineffective because he had a constitutional right to remain silent and to not have that silence held against him. In particular, Petitioner contends that counsel

-14-

should have objected during the following cross-examination exchange between the State and Sergeant Prewitt, whom the defense called as a witness as a part of its case:

> Q. You've already told [trial counsel] that you could not get a statement from [Petitioner]; is that correct?
>
> A. Correct.
>
> Q. Once a defendant is charged with a crime and has a lawyer can you go talk to him?
>
> A. Not unless he wants to talk to us.
>
> Q. Has [Petitioner] ever called you and told you he wanted to talk to you?
>
> A. No.
>
> Q. Has [Petitioner] ever called you or anybody in your office and told you that he wanted to give you his version of what happened?
>
> A. No.

Petitioner also points to a number of the State's questions to him during cross-examination as being impermissible for impeachment. For example, Petitioner complains that trial counsel should have objected during this exchange:

> Q. [Petitioner], how many times have you been in this court?
>
> A. You know, several times.
>
> Q. How many?
>
> A. Approximately five, maybe six.
>
> Q. Now you told the jury that you never told anybody in law enforcement that somebody tried to kill you; is that correct?
>
> A. I said I never told those officers somebody tried to kill me.
>
> Q. You never picked up a phone after you were well to call any police officers to say, look, I need to tell you what happened on May 18, 2002, these folks attacked me. You never did that, did you?
>
> A. No. Reason being, I was already charged for — I automatically assumed they done charged me. I automatically assumed that this is going to have to come out in court. And, you know, you automatically assumed that if they'd come interviewed and you already charged with a crime, you know, you just assume that, hey, the police is going to believe their side and not yours. It's just a common assumption.

Similarly, Petitioner contends counsel should have objected to several statements the State made during its closing argument. While there are many specific statements about which Petitioner complains, the following illustrates the nature of the complaint:

-15-

And I emphasize it and I put it in bold writing, that he never in told anybody that ridiculous tale until he told you yesterday, eighteen months after this shooting took place. I asked [Petitioner] yesterday . . . how many times have you been in this courtroom? How many times you have told anybody in law enforcement this ridiculous theory about how you're trying to protect yourself from Teresa Washington and James Davis. How many times? Zero.

How many times have you told me . . . that you need to look into this because this ain't right, these folks are trying to railroad me. I'm defending myself. . . .

If at any point in the past six hundred and twenty-two days or whatever it's been now that he has been in custody, charged with trying to kill two people, if he thought any of that was true, he could have had that investigated by some law enforcement agency if he wanted to. He did not want it investigated because he knew it was not the truth. He knew it was not justice. For the same reasons he fled . . . are the same reason why he withheld this information from law enforcement because he knows it is not the truth. So he comes to court and he takes one shot, roll of the dice, let me, let me throw it out there one time, drop it on the jury. And let me see if I can get at least one juror to say, well, maybe he's telling the truth. And that's why he waited until January 28th, 2004, to tell somebody about this ridiculous self-defense argument.

We agree with the post-conviction court that trial counsel's decision to not object did not render her assistance ineffective.

Petitioner is correct that he had the right to remain silent. U.S. Const. amend. V; Miranda v. Arizona, 384 U.S. 436 (1966). However, "[o]nce a defendant decides to testify," he "cast[s] aside his cloak of silence," and the Fifth Amendment allows him to be subjected to at least some degree of impeachment based on his prior silence. Jenkins v. Anderson, 447 U.S. 231, 238 (1980). Thus, the Fifth Amendment permits a defendant to be impeached "by use of prearrest silence." Id. at 240. Generally, a defendant may not be impeached based on his silence after he was given a Miranda warning. See Doyle v. Ohio, 426 U.S. 610, 619-20 (1976). Doyle reasoned that when a defendant receives a Miranda warning, the government *induces*, or at least arguably induces, subsequent silence. See id. at 617-19. Inducement is not present when the government has arrested an individual but not yet informed him of his Miranda rights. See Fletcher v. Weir, 455 U.S. 603, 605-07 (1982) (per curiam). Consequently, it does not violate due process to allow the State to impeach a defendant with evidence of post-arrest, but pre-Miranda warning, silence. Id. at 606-07.

These United States Supreme Court decisions provide the outer boundary of permissible impeachment allowed by the Fifth Amendment. As Jenkins notes, "[e]ach jurisdiction may formulate its own rules of evidence to determine when prior silence is so inconsistent with present statements that impeachment by reference to such silence is probative." 447 U.S. at 239.

Prior to Doyle, Jenkins, and Weir, our supreme court addressed the issue of impeaching a defendant with his prior silence in Braden v. State, 534 S.W.2d 657 (Tenn. 1976). In Braden, the court explained that in order to "strike a balance between protecting the self-incrimination bar of the Fifth Amendment and allowing full testing of the truth of defendant's trial testimony . . . evidence of pretrial silence of the defendant must be admitted with caution and then only where such silence is patently inconsistent with defendant's testimony." Id. at 660. Thus, evidence elicited for "the impeaching effect of any prior inconsistent actions" by the defendant, including prior silence, could be elicited in certain circumstances. Id.

The Braden rule was obviously limited by the Doyle line of cases. But as this court explained in State v. Chris Haire, "Braden's 'patently inconsistent' qualification is still viable in the factual context [of post-arrest, pre-Miranda warning silence]." No. E2000-01636-CCA-R3-CD, 2002 WL 83604, at *15 (Tenn. Crim. App. at Knoxville, Jan. 22, 2002). "The result is that Tennessee restricts impeachment use of a defendant's post-arrest silence that precedes Miranda warnings to those situations wherein it is patently or blatantly inconsistent with trial testimony." Id.; see also State v. Jonathan D. Rosenbalm, No. E2002-00324-CCA-R3-CD, 2002 WL 31746708, at *5-6 (Tenn. Crim. App. at Knoxville, Dec. 9, 2002).

Although there is a paucity of Tennessee cases demonstrating the types of situations in which the State can use a defendant's silence for impeachment, several cases from other jurisdictions provide useful illustrations. In State v. Cockrell, for instance, the Wisconsin Court of Appeals dealt with a defendant who was convicted of shooting someone in a car that had pulled up next to him at a McDonald's drive-through. 741 N.W.2d 267, 269 (Wis. Ct. App. 2007). When Cockrell turned himself in to the police, he told them about his history with the victim. Id. However, he refused to speak to the officers about the incident itself until he had counsel. Id. He remained silent until trial, when he testified that he acted in self-defense, claiming that the victim pointed a gun at him first. See id. at 269-70. Cockrell also testified that he refused to tell the police about the incident without counsel "because things can be misinterpreted or written down incorrectly." Id. at 270. On cross-examination, the state attempted to impeach Cockrell's testimony by questioning him about his previous silence. Id. On appeal, Cockrell challenged the state's questions as a violation of his right to remain silent. Id. The court explained that there are several situations in which the state's use of a defendant's post-Miranda silence for impeachment is not a violation of due process.

-17-

See id. at 270-72. For instance, the state may do so "where the defendant's testimony conveys that he or she cooperated with the police," "where the defendant volunteered on direct his reason for not telling the police his version of the crime," and "where the defendant testified that he attempted to tell the officers what happened but they would not let him speak." Id. at 271-72. The court concluded that the state's use of Cockrell's post-Miranda silence was not "fundamentally unfair" because he "initiated the topic of why he chose to remain silent [and] his explanation put him in a better position than had he not mentioned the reason." Id. at 275. Moreover, the state's use of Cockrell's silence was limited to impeaching his explanation, the state did not equate that silence to guilt. See id. at 275-76.

The court's reasoning in Cockrell is similar to that in United States ex rel. Saulsbury v. Greer, 702 F.2d 651 (7th Cir. 1983). There, the court explained that

> Once [a] reason [for the defendant's prior silence] was solicited upon direct examination it was not fundamentally unfair for the prosecution, upon cross-examination, to attack the credibility of that explanation by eliciting testimony that the defendant had failed to come forward with his exculpatory explanation long after the Miranda warnings and after circumstances had made the need for such an explanation, if it existed, far more compelling.

Id. at 655-56. Because the defendant had "ventured" so far as to give an explanation for his silence, he "could not erect a constitutional barrier against the state exploring the soundness of that explanation by measuring it against the defendant's subsequent failure to assert it" earlier. Id. at 656.

In State v. Alo, the court likewise found that the state could impeach a defendant's exculpatory version of the facts by reference to his prior silence. 558 P.2d 1012 (Haw. 1976). There, Alo was charged with attempted murder after his girlfriend claimed that he beat her, drove her to a secluded area, shot her, and left. Id. at 1013-14. The victim survived and immediately reported the crime. Id. at 1014. The police quickly found Alo walking toward his apartment. Id. While he declined to give a statement at the police station, at trial Alo claimed that he told the officer that stopped him that he had been on a walk when the incident occurred. Id. at 1014-15. On cross-examination, the state elicited testimony that Alo had not told the police his version of the events when he was at the station. Id. at 1015. On appeal, the court explained that "the prosecution was not bound to accept as true the defendant's testimony on direct examination" and it "had the right to determine whether and exactly to whom the defendant was supposed to have given his exculpatory version." Id. Such questions "were a natural and logical sequel to the defendant's testimony," and therefore were "not calculated to penalize the defendant for his silence." Id. at 1016.

As these cases make clear, the law does not exclude evidence of a defendant's silence "so that the defendant may freely and falsely create the impression that he has cooperated with the police when, in fact, he has not." United States v. Fairchild, 505 F.2d 1378, 1383 (5th Cir. 1975). Even if exclusion of such evidence is ordinarily required by due process, once the defendant broaches the subject of his cooperation or explains his silence, "the bar [is] lowered and he discard[s] the shield which the law had created to protect him." Id.

In the present case, the post-conviction court concluded that counsel's decision to refrain from objecting was not deficient because the questions did not intrude on Petitioner's Fifth Amendment rights. In other words, an objection to the State's questions about Petitioner's post-arrest silence would have been overruled. The court concluded that Petitioner's decision to remain silent and not tell law enforcement his version of the events was not deficient because Petitioner's silence "was patently or blatantly inconsistent with his trial testimony," and thus proper fodder for impeachment. It also explained that the questions were valid because Petitioner opened the door to the State's line of attack. Indeed, it credited trial counsel's testimony that Petitioner waived his Fifth Amendment right to silence, and the concomitant right to not have his silence held against him, by virtue of asserting his self-defense-and-shoddy-investigation theory of the case.

We agree with the post-conviction court. We begin by noting that Petitioner does not contend that the defense strategy of arguing that Petitioner was the actual victim and that law enforcement conducted a shoddy investigation was somehow deficient. Nor does he challenge the decision to call Sergeant Prewitt as a defense witness for the purpose of eliciting that the police had not interviewed anyone other than the victims. These critical points lead us to conclude that the post-conviction court did not err in crediting trial counsel's testimony that Petitioner waived his Fifth Amendment rights because "he wanted to bring it out during the trial that he wasn't being given an opportunity or had never been given an opportunity to make a statement."

Petitioner's position thus appears to be that he is allowed to testify and present evidence that, despite his desire to tell his side of the story, the police never gave him an opportunity to make a statement; yet the State is not allowed to point out Petitioner's inconsistent behavior and the fact that he never made any effort to relay his version of the events. This position goes too far. Petitioner tried to create the impression that he wanted to cooperate but was thwarted by myopic investigators. As the court in Cockrell wrote, once a defendant explains his silence, "his explanation put[s] him in a better position than had he not mentioned the reason; it [is] not fundamentally unfair for the State on cross-examination to attack the credibility of that explanation by eliciting the testimony that, even after there was a compelling need for him to come forward with his self-defense version of the fight,

-19-

he did not." 741 N.W.2d at 275 (citing <u>Saulsbury</u>, 702 F.2d at 655-56). In our view, Petitioner opened the door to impeachment based upon his theory of the case.

Moreover, the record makes clear that Petitioner's counsel brought up Petitioner's silence before the State ever asked any of the questions about which he now complains. Specifically, during the direct examination of Sergeant Prewitt, who was called as a defense witness to show that the police neglected to take statements from anyone other than the victims, trial counsel asked:

> Q. Did you take any other statements in this case?
> A. No. . . . And [Petitioner] couldn't [make a statement] either.
> Q. He was unable to do it?
> A. Yes.
> Q. [Petitioner] was unable to make a statement to you?
> A. Yes.
> Q. At the hospital. Okay. At any other time did you attempt after [Petitioner's] release [from the hospital], did you attempt to take a statement from him?
> A. No.
> Q. And so during the conduct of your investigation you never got [Petitioner's] side of what happened on [May 18, 2002] at 680 Glanker?
> A. No.
> Q. Okay. Ever?
> A. No.

That line of questioning opened the door for the State's cross-examination about whether Petitioner ever made an affirmative effort to speak to law enforcement.

The same is true with respect to the State's questions during Petitioner's cross-examination. On direct examination, trial counsel opened the door by asking Petitioner:

> Q. Were you ever offered a chance to make a statement to the police?
> A. No, ma'am.
> Q. And were you ever given an opportunity to request to make a statement to the police?
> A. No, ma'am.
> Q. Okay. And why were you not given — why in your opinion do you think you were not given a chance to make a statement to police?

A.     Well, I always thought that if, that according to my experiences since I've been down here, which has almost been two years, that it's a standard operating procedure for the police to come down and interrogate a suspect once they get downtown. I've been down here for going on two years and no officer made no attempt to come down and interrogate me for nothing or get my opinion on nothing. My first time being locked up for an offense like this period.

This statement invited the State's cross-examination questions regarding whether Petitioner affirmatively sought to make a statement. Counsel's failure to object was not deficient because the defense opened the door to such questions.

Finally, the defense's strategy made any Fifth Amendment objection to the State's comments on Petitioner's pre-trial silence meritless. As trial counsel explained, to assert Petitioner's self-defense-and-shoddy-investigation theory, Petitioner waived his Fifth Amendment right to remain silent and to not have that silence held against him. The State's closing response to Petitioner's theory therefore did not violate Petitioner's Fifth Amendment rights, and any objection to that effect would not have been sustained.

Petitioner asserts that, even if he did invite the State's use of his post-arrest silence, the State went far beyond using that silence for impeachment purposes and instead used it to equate his silence with guilt. Petitioner cites this court's decision in State v. Eric Flemming, No. 01C01-9709-CR-00418, 1999 WL 20800 (Tenn. Crim. App. at Nashville, Jan. 20, 1999), as support for his position. Flemming involved an aggravated robbery. Upon arrest, Mr. Flemming claimed that he knew nothing of the crime except that he had heard the name of the perpetrator. Id. at *5. Mr. Flemming stopped talking to the police "when it became clear that they did not believe him." Id. At trial, the State used Mr. Flemming's silence to argue that he refused to speak in order to make sure he did not tell a story that police could prove was false. See id. at 11. This, we said, "was an obvious violation of [Mr. Flemming's] Fifth Amendment right to silence." Id.

Although the State made similar "silence equates to guilt" comments during its closing in the present case, this case contains a subtle, but critical, difference. Whereas Mr. Flemming asserted that he knew nothing about the crime other than the name he had heard, Petitioner does not dispute that he shot Mr. Davis. Petitioner claims he was defending himself as Ms. Washington and Mr. Davis attempted to murder him. The context of the two cases is important. If Mr. Flemming's credibility was impeached, it merely meant his statement that he did not know anything about the crime other than the perpetrator's name cannot be believed. However, he could still assert that he did not actually commit the crime. The implications for impeaching Petitioner's testimony about his version of events are much

different. As we have noted, Petitioner admitted that he shot Mr. Davis. The only question was why. Petitioner testified that he acted in self-defense. But if the State impeached the credibility of Petitioner's claim that he was attacked, then the self-defense theory collapses. In Flemming, the jumps from (1) silence to (2) discrediting Mr. Flemming's statement that he knew nothing about the crime to (3) guilt are too big. But in Petitioner's case, it is only logical that if his statement that he was attacked cannot be believed, then there is no legal justification for shooting Mr. Davis.

Petitioner's ineffective assistance of counsel claims concerning his Fifth Amendment right to silence fail.

## 2. Prosecutor misconduct

Petitioner next contends that trial counsel was ineffective for failing to object to several episodes of alleged prosecutorial misconduct during the State's closing arguments. He relies upon this court's decision in State v. Goltz, in which we outlined "five general areas of prosecutorial misconduct" that can occur during closing argument: (1) intentionally misleading or misstating the evidence; (2) expressing a personal belief or opinion as to the truth or falsity of the evidence or defendant's guilty; (3) making statements calculated to inflame the passions or prejudices of the jury; (4) injecting broader issues than the guilt or innocence of the accused; and (5) intentionally referring to or arguing facts outside the record that are not matters of common public knowledge. 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003). In addition, he notes that "[t]he prosecution is not permitted to reflect unfavorably upon defense counsel or the trial tactics employed during the course of the trial." State v. Gann, 251 S.W.3d 446, 460 (Tenn. Crim. App. 2007). Petitioner contends that the State violated several of these principles at various times during its closing argument.

Petitioner first contends the State crossed the line by reminding the jury that it "took an oath that if the State of Tennessee presented proof . . . beyond a reasonable doubt that the defendant attempted to kill [the victims] . . . [the jury] would . . . find the defendant guilty," and then later asserting a guilty verdict "is the verdict that truth dictates and that justice demands and any other verdict would be a violation of the oath that [the jurors] took to return a true verdict." Petitioner claims the State's argument expressed a personal belief or opinion as to the truth or falsity of the evidence of Petitioner's guilt, made statements calculated to inflame the passions or prejudices of the jury, and intentionally referred to or argued facts outside the record that are not matters of common public knowledge, all in violation of Gotlz, and thus counsel should have objected. See 111 S.W.3d at 6.

We disagree. Nothing in the passage quoted above expresses the prosecutor's "*personal* belief or opinion." Goltz, 111 S.W.3d at 6 (emphasis added). We read these

statements as counsel's articulation of the *State's* position.  Nor do we read the statement as one designed to inflame the passions or prejudices of the jury or injecting broader issues into the trial.  It simply reminded the jury of its oath and asserted the State's position that it had met its burden, thereby necessitating, in the State's view, a guilty verdict.

Six other passages to which Petitioner points are more disturbing.  Those passages are as follows:

> How many times have you told me, [Petitioner], that you need to look into this because this ain't right, these folks are trying to railroad me.  I'm defending myself. . . . [Petitioner] went, well that's not [the prosecutor's] job.  You're trying to convict me.  I don't take an oath to convict anybody.  I don't take an oath to convict [Petitioner] or any defendant ever of any crime.  The oath that I took before I became a prosecutor was to seek truth and justice.  Truth and justice.  It would be unethical for me as a prosecutor to present facts to you that I don't believe are factually based, there's a factual basis for that.  It would be unethical for me to continue to prosecute a case in which I don't believe there's some good-faith basis.
> ****
> This defendant is guilty.  [Trial counsel] has a job to zealously represent her client.  That's the oath she takes as a defense lawyer.  To zealously represent her client.  I don't take an oath to zealously represent the people of the State of Tennessee.  I don't take an oath to zealously represent the people of Shelby County, Tennessee.  I take an oath to seek truth and justice.
> ****
> I don't represent the government.  I represent the people of the State of Tennessee.  I represent the State of Tennessee, not the government.  I represent specifically people here in Shelby County, Tennessee.  So when people stand up and start telling you that [the prosecutor] represents the government, I don't know what government that is.  I represent you, your neighbor, your loved ones, people in this community, that's who I represent.
> ****
> If the truth is [Petitioner] is not guilty based on the proof that I've submitted to you, that the State of Tennessee has presented in court, it is my oath, my duty, my obligations to stand before you and say, ladies and gentlemen of the jury, I haven't proven this case.  I can't ask you to find [Petitioner] guilty.  That would be wrong.  It's a violation of my ethical duties in order for me to stand here and tell you to find this man guilty if there is no facts to prove him guilty.
> ****

-23-

[Petitioner] is still in jail six hundred and twenty-two plus days because that's where he deserves to be. He is still in jail and not running free on bond because he is a danger to this community. He is in jail for six hundred and twenty-two some-odd days because he is a threat to kill somebody. Judge Bennett was not fooled by anybody when Judge Bennett made the decision to revoke this defendant's bond and to keep him in jail. And for some lawyer to stand up here and tell you that this judge has been fooled is absolutely, absolutely an insult. And you should all be offended by those statements from [trial counsel].

[Petitioner] is in jail for six hundred and twenty-two days because he deserves to be in jail, not for six hundred and twenty-two days but for a lot longer than six hundred and twenty-two days.

****

[Trial counsel] tells you that Teresa Washington fooled the Judge when she testified at a bond hearing on [Petitioner]. That's insulting. This judge, Judge Bennett, has been in this business for longer than he would like to count. He's been the only judge in this court since 1976 or 1977. Ms. Hailey will tell you that Ms. Washington fooled the Judge. That is absolutely insulting.

It is true that prosecutors have an obligation to seek truth and justice. See State v. David Lynn Jordan, No. W2007-01272-SC-DDT-DD, __ S.W.3d __, 2010 WL 3668513, at *51 (Tenn. Sept. 22, 2010) (quoting Berger v. United States, 295 U.S. 78, 88 (1935)). But the prosecutor's statements quoted above combine to form a troubling theme: that the prosecutor, who represents the jurors, their families, and their friends, and who is ethically obligated to seek only "truth and justice" and withdraw the case if the evidence is insufficient, believes Petitioner is guilty; Petitioner's defense attorney, on the other hand, who is only obliged to "zealous represent her client" and is not obliged to seek truth and justice, has insulted the jury; and the trial judge, whom the jury should see as neutral arbiter of the law, agrees that Petitioner is guilty. That is the underlying message of these statements.

Petitioner asserts that trial counsel should have objected to these statements as violations of the principles articulated in Goltz and Gann. The record reflects that trial counsel did object to portions of the State's closing. In particular, the defense argued that the State improperly implied that the defense attorneys were not obliged to seek truth and justice but were instead permitted to present a version they knew to be false. The objection was noted, but overruled. However, when counsel was asked why she did not object to each individual statement, counsel said that she did not believe the objections were necessary or would be well-taken or that she was contemplating which objection to raise. The post-

-24-

conviction court concluded that the statements were not improper because the prosecution was responding to Petitioner's assertion from the witness stand that he did not tell the prosecutor his version of the story because the prosecutor was only interested in convicting him and because, in the context of this "hard-fought" case, the statements were not out of line.

While we agree that the prosecutor's statements are dangerously close to the lines staked out by Goltz and Gann, we do not believe counsel's conduct amounts to ineffective assistance warranting relief. Regardless, Petitioner has not established prejudice. As a result, it is unnecessary to determine whether the fact that counsel made only a few objections to the State's closing satisfies the deficiency prong of the Strickland analysis.

Our supreme court has recently reminded the bar "that closing arguments must be (1) temperate; (2) predicated on the evidence adduced at trial; and (3) pertinent to the issues." Jordan, No. W2007-01272-SC-DDT-DD, __ S.W.3d __, 2010 WL 3668513, at *51 (Tenn. Sept. 22, 2010). The court added that "because a prosecutor's role is to seek justice rather than simply advocate, the State's prerogative during argument is more limited than that of other parties." Id. Yet, because "[c]losing arguments are an important tool for both parties during the trial process . . . attorneys are usually given wide latitude in the scope of their arguments" and "[t]rial courts are accorded wide discretion in their control of those arguments." State v. Berry, 141 S.W.3d 549, 586 (Tenn. 2004). Given the trial court's tepid reaction to the defense's objections at closing, we think it unlikely the trial court would have sustained additional objections. Consequently, Petitioner would have to clearly establish that the statements "affected the verdict to [his] prejudice." Id. (quotation marks omitted); see also Goltz, 111 S.W.3d at 5; State v. Middlebrooks, 995 S.W.2d 550, 560 (Tenn. 1999).

We consider five factors in evaluating whether prosecutorial misconduct during closing justifies reversing the verdict:

> 1) the conduct complained of, viewed in light of the facts and circumstances of the case; 2) the curative measures undertaken by the court and the prosecution; 3) the intent of the prosecutor in making the improper arguments; 4) the cumulative effect of the improper conduct and any other errors in the record; and 5) the relative strength and weakness of the case.

Berry, 141 S.W.3d at 586; see also Jordan, No. W2007-01272-SC-DDT-DD, __ S.W.3d __, 2010 WL 3668513, at *51-52. We conclude that these factors would not have weighed in favor of reversing Petitioner's conviction. We agree with the post-conviction court that the record indicates that the State's comments came in the midst of a "hard-fought" case. Moreover, the comments were partly in response to Petitioner's testimony that he did not tell

the prosecutor his version of the story because the prosecutor's job was to convict him.[1] The first factor is thus neutral. Factors (2) and (3) weigh in favor of the Petitioner because the trial court took no curative measures specifically tailored to counter the statements and the prosecutor's motive for making them appears to have been to combat defense counsel's theory of the case by boosting the jury's faith in the prosecutor's version of events.[2] But even though these factors weigh somewhat in Petitioner's favor, they are outweighed by the remaining two. We do not believe the cumulative effect of these statements and any other errors in the record caused the jury to lose sight of its duty. Moreover, the evidence against Petitioner was devastating. Each of the two victims, one of whom had been shot in the chest, testified that Petitioner came to Ms. Washington's house with a gun and shot Mr. Davis, disputing Petitioner's self-defense claim. They immediately told their story to the police and did so at separate times, without the opportunity to communicate beforehand. Petitioner's self-defense argument was discredited when Petitioner was impeached with his failure to tell anyone in law enforcement his version of the story. The prosecutor's closing statements at issue did not concern those facts. Thus, we conclude the statements were superfluous to the jury's ultimate conclusion, which it made in light of the overwhelming evidence of Petitioner's guilt. Consequently, we do not believe Petitioner has established that he was prejudiced by counsel's failure to object to the prosecutor's statements.

The next set of statements that Petitioner contends were improper and warranted an objection involved the State's commentary on trial counsel's closing argument. As noted above, trial counsel acknowledged at the post-conviction hearing that her closing argument was "novel." As we explained, during the closing, trial counsel told the story of the case from the perspective of Ms. Washington's purported alter ego, Reecy. In rebuttal, the State dismissed trial counsel's closing as a "comedy routine" that was "degrading" and "insulting."

---

[1] In that regard, the State's comments appear to be like those in Jordan, where the State attempted to "strike back" at the defense's argument. See No. W2007-01272-SC-DDT-DD, __ S.W.3d __, 2010 WL 3668513, at *52. As the supreme court explained in Jordan, "[w]hile the prosecutor reached too far in his argument, it appears that the prosecutor was at least trying to place his argument in some overall context triggered by the argument of defense counsel." Id.

[2] Again, Jordan is instructive. It reminds the bar "that it is incumbent upon defense counsel to object contemporaneously whenever it deems the prosecution to be making improper argument," so that the trial court has the opportunity to evaluate the argument and take any curative measures it deems necessary. No. W2007-01272-SC-DDT-DD, __ S.W.3d __, 2010 WL 3668513, at *44. The court warned that failure to do so waives the issue. Id. However, the court also noted that even absent an objection, the trial court "may intervene *sua sponte* when prosecutorial argument is clearly improper." Id. at 44 n.14.

We also note that, as in Jordan, the trial court in this case gave the jury a general instruction that counsels' arguments are not evidence and should be disregarded if they contradict the jurors' recollection of the evidence. See id. at *53.

Petitioner, citing Gann, asserts that the State's commentary improperly attacked counsel and her tactics.

The post-conviction court concluded that trial counsel was not deficient because these statements were not improper personal attacks. Instead, the comments responded to trial counsel's unique closing and focused on the defense's theory of the case.

We agree with the post-conviction court's conclusion. We read these statements to be comments upon the defense's theory, rather than personal comments about trial counsel. Trial counsel testified at the post-conviction hearing that she had the same reaction to the statements. We thus conclude that the Berry factors counsel the same conclusion as we reached above. See 141 S.W.3d at 586.

The final set of comments to which, Petitioner contends, trial counsel should have objected concerned Petitioner's burden of proof. The two statements about which Petitioner complains are as follows:

> If at any point [Petitioner] thought any of this was true, and he doesn't have to prove anything because that's the State's burden, but once he starts presenting facts to you, you have the same obligation to view what he tells you as you do in what the State presents. If he presents something to you, if he chooses to, it's his obligation to prove to you that it's true. It is not the State's obligation to prove to you that it's not true. He made that choice to put that ridiculous self-defense argument before you. It's his obligation to prove that's true.
>
> ****
>
> What you've heard in court absolutely from [Petitioner] — and I'll state again, [Petitioner] does not have to present any proof. He doesn't have to prove anything. But once he takes the stand and tells you something, he presents that proof, it is absolutely his obligation to convince you that what he is saying is correct. It's his obligation to convince you that he is credible. It's his obligation to convince you that he is a truth teller.

Petitioner contends that such statements improperly indicate that Petitioner bears the burden of proof in his self-defense claim. See State v. Belser, 945 S.W.2d 776, 782 (Tenn. Crim. App. 1996) (noting that the State "has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense"). As a result, Petitioner argues, counsel was deficient for not objecting.

We are not persuaded. The State repeatedly stated that Petitioner was presumed innocent and did not have to prove anything. The State also accurately noted that Petitioner

-27-

bore the burden of persuading the jury that he was credible. See, e.g., 7 Tenn. Prac. Pattern Jury Instr. T.P.I. – Crim. 42.04. Counsel was therefore not deficient in withholding an objection.

After a thorough review, we conclude that, as the post-conviction court commented, the case was hard-fought. Parts of the State's closing may have been inappropriate, but Petitioner is not entitled to relief. The statements either did not warrant further objection or do not provide a basis for finding prejudice.

### 3. Fingerprint evidence

Petitioner contends that trial counsel was deficient for failing to seek fingerprint evidence on the magazine and unfired bullet in the .380 handgun used to shoot Mr. Davis. However, Petitioner has failed to present any evidence to show that there were any fingerprints on the magazine or bullet, let alone that such prints would have helped his defense. As Petitioner correctly notes, "[w]hen a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). That is true in cases concerning possible fingerprint evidence. See Edward R. Forester v. State, No. E2005-01922-CCA-R3-PC, 2006 WL 2706150, at *8 (Tenn. Crim. App. at Knoxville, Sept. 21, 2006). Petitioner failed to present an expert to testify about what fingerprints were present on the magazine or unfired bullet. Indeed, it is not at all clear there even were any fingerprints to be found. Petitioner has thus failed to demonstrate prejudice.

Petitioner has failed to establish that he is entitled to relief on any of his ineffective assistance of counsel claims.

### B. Sentencing

Petitioner's final argument is that the trial court improperly enhanced his sentence based upon facts found by the court rather than the jury. This, he argues, ran afoul of the jury trial protections in the Sixth Amendment to the United States Constitution as articulated by the United States Supreme Court in Blakely.

Petitioner raised the same issue in his direct appeal. See Morris, No. W2004-02277-CCA-MR3-CD, 2005 WL 6235723, at *8-9. We held that Petitioner's Blakely claim failed because, according to our supreme court's analysis in the then-controlling case of Gomez I, Tennessee's sentencing regime was unaffected by Blakely. See id. at *9.

The United States Supreme Court reversed the decision in Gomez I in light of Cunningham v. California, 549 U.S. 270 (2007), and remanded the case to our supreme court for reconsideration. On remand, our supreme court acknowledged that "the Reform Act failed to satisfy the Sixth Amendment insofar as it allowed a presumptive sentence to be enhanced based on judicially determined facts." State v. Gomez, 239 S.W.3d 733, 740 (Tenn. 2007) (Gomez II). It held that "to the extent the Reform Act permitted enhancement based on judicially determined facts other than the fact of a prior conviction, it violated the Sixth Amendment as interpreted by the Supreme Court in Apprendi [v. New Jersey, 530 U.S. 466 (2000)], Blakely, and Cunningham." Id.

Although this court ruled that Petitioner's direct appeal Blakely challenge was governed by Gomez I and did not merit relief, Petitioner cannot now revive that issue on collateral review. Because Blakely concerns a federal issue, the final arbiter of the governing law is the United States Supreme Court, not our state courts. Consequently, even though Petitioner "might arguably have been mislead" by Gomez I, his avenue for Blakely relief was to continue to press the claim on direct appeal through our supreme court and to the United States Supreme Court. State v. Christine H. Osborne, No. M2006-01301-CCA-R3-CD, 2008 WL 1822443, at *5 (Tenn. Crim. App. at Nashville, Apr. 23, 2008); see also State v. Mitchell Richardson, No. E2006-01580-CCA-R3-CD, 2008 WL 2037274, at *11 (Tenn. Crim. App. at Knoxville, May 13, 2008) ("[T]he United States Supreme Court, rather than the Tennessee Supreme Court, is the final arbiter of questions concerning the federal constitution, and the defendants' Blakely claim should have been raised . . . Gomez I notwithstanding.").

Because Blakely was issued before Petitioner's direct appeal was final, it cannot form the basis for a claim for relief grounded in a newly-recognized constitutional right. See Tenn. Code Ann. § 40-30-106(g)(1). Petitioner seeks "retroactive" relief from Cunningham. But section 106(g) bars relief on that ground as well. As we have repeatedly said, neither Blakely, nor Cunningham, nor Gomez II announced a new rule of law. See, e.g., Christopher N. Orlando v. State, No. M2008-01621-CCA-R3-PC, 2010 WL 10967, at *3 (Tenn. Crim. App. at Nashville, Jan. 4, 2010). The "new rule" was recognized in Apprendi; Blakely and the like merely clarified that rule. See Bobby Taylor v. State, No. M2008-00335-CCA-R3-PC, 2009 WL 2047331, at *2 (Tenn. Crim. App. at Nashville, July 14, 2009), perm. to appeal denied, (Tenn. 2009). Apprendi, like Blakely, had been decided at the time of Petitioner's direct appeal; his avenue for relief was on direct appeal. See Tenn. Code Ann. § 40-30-106(g); see also Anwar Proby v. State, No. W2008-00700-CCA-R3-PC, 2008 WL 4756678, *2 (Tenn. Crim. App. at Jackson, Oct. 27, 2008). Consequently, the rule was available to Petitioner on direct appeal, and section 106(g) bars Petitioner's requested relief.

Petitioner correctly notes that Danforth v. Minnesota held that the states are no longer required to apply the Teague v. Lane, 489 U.S. 288 (1989), analysis when determining

whether to give retroactive effect to a new federal rule of law. See 552 U.S. 264, 290-91 (2008). It is also true that this court has applied the Teague analysis when determining retroactivity of the Apprendi line of cases. See, e.g., Donald Branch v. State, No. W2003-03042-CCA-R3-PC, 2004 WL 2996894, at *9-10 (Tenn. Crim. App. at Jackson, Dec. 21, 2004). Given our analysis above, Danforth is unhelpful because Petitioner does not meet the exception for new rules that is codified in section 106(g)(1). Nevertheless, to the extent Teague effects our analysis of whether Cunningham or Gomez II announced a new rule, we applied Teague because we were instructed to do so by our supreme court. See Meadows v. State, 849 S.W.2d 748, 754 (Tenn. 1993) ("[S]tates are bound by federal retroactivity analysis when a new federal rule is involved."). Despite Danforth's holding, we are bound to follow our supreme court's directive in Meadows as to the retroactivity analysis applied to new federal rules until it decides otherwise. See State v. Irick, 906 S.W.2d 440, 443 (Tenn. 1995).

### III. Conclusion

After a thorough review, we affirm the judgment of the post-conviction court.

_____
NORMA McGEE OGLE, JUDGE